**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**KENNETH CHARLES O'NEIL,**

      **Plaintiff,**

   v.                                                 **Civil Action 2:19-cv-2966
Magistrate Judge Jolson**

**COMMISSIONER OF SOCIAL
SECURITY,**

      **Defendant.**

## OPINION AND ORDER

Plaintiff, Kenneth Charles O'Neil, filed this action seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying his application for Supplemental Security Income ("SSI") under Title XVI. The parties in this matter consented to the Undersigned pursuant to 28 U.S.C. § 636(c). (Docs. 9, 10). For the reasons that follow, Plaintiff's Statement of Errors (Doc. 14) is **OVERRULED**, and judgment is entered in favor of Defendant.

### I. BACKGROUND

#### A. Prior Proceedings

Plaintiff filed an application for SSI on August 17, 2012 under Title XVI, alleging disability beginning on November 1, 2007. (Doc. 13, Tr. 174–79). His application was denied initially and again on reconsideration, and after a hearing held on August 12, 2014 (Tr. 50–72), Administrative Law Judge Edmund E. Giorgione (the "ALJ") issued an unfavorable decision. (Tr. 536–58). The Appeals Council denied Plaintiff's request for review making the ALJ's decision the final decision for purposes of judicial review. (Tr. 530–35). Plaintiff then filed a case in this Court. (*See O'Neil v. Comm'r of Soc. Sec.*, 2:16-cv-117 (S.D. Ohio)). On August 17, 2016, the case was remanded to the Commissioner. (Tr. 519–23, 524–29).

Another hearing was held before ALJ Jeffrey Hartranft on August 21, 2017. (Tr. 496–518). On September 6, 2017, the ALJ issued an unfavorable decision. (Tr. 473–95). Again, Plaintiff filed a case in this Court. (*See O'Neil v. Comm'r of Social Security*, 2:17-cv-978 (S.D. Ohio)). That case was also remanded to the Commissioner. (Tr. 830–39). Another hearing was held before ALJ Hartranft on February 12, 2019. (Tr. 803–24). On May 7, 2019, the ALJ issued an unfavorable decision. (Tr. 776–802). That decision became the final decision for purposes of judicial review.

Plaintiff filed this action on July 9, 2019 (Doc. 1), and the Commissioner filed the administrative record on September 19, 2019 (Doc. 13). Plaintiff filed a Statement of Specific Errors (Doc. 14), the Commissioner responded (Doc. 16), and Plaintiff replied (Doc. 17).

### B. Relevant Medical Background

Plaintiff's statement of errors concerns his alleged mental impairments. The ALJ helpfully summarized the relevant evidence:

> The claimant has alleged an inability to read, write or count money. However, school records indicate that the claimant was in the developmentally handicapped program due to borderline range of cognitive abilities, but was able to understand and carry out simple writing, reading and math tasks (C1F). Intelligence testing from September 1995 shows that the claimant scored a composite IQ of 73 (C1F).
>
> In February 2010, the claimant underwent a diagnostic assessment reporting that he was depressed (Exhibit C2F). He was diagnosed with depressive disorder and personality disorder and assigned a GF of 51 (C2F). Treatment notes from July 2010 indicate that the claimant was also diagnosed with borderline intellectual functioning (C2F/7). A mental status examination from that date revealed that the claimant had logical thought processes, normal motor activity, cooperative behavior and fair insight and judgment (C2F). In August 2010, the claimant reported that his depression was "barely there" (C2F/9).
>
> The claimant underwent a psychological consultative evaluation on November 12, 2012 with Dory Sisson, Ph.D. (C4F). On examination, the claimant had a flat and dysphoric rate of speech and volume, he was oriented times three and was flowing,

2

relevant, goal directed and coherent. The claimant was administered the WAISD-IV intelligence test and earned an overall intelligence score in the low range (FSIQ -68) and all of his composite scores fell in the low/borderline range (C4F/8). Dr. Sisson diagnosed the claimant with mood disorder, borderline intellectual functioning, and assigned a GAF of 60.

Treatment notes from December 2012 and early 2013 indicate that the claimant had a normal mood and affect with no reported psychiatric complaints (C5F/3, 7).

The claimant initiated mental health treatment on March 25, 2013 and underwent a psychiatric diagnostic assessment with Ajay Sharma, M.D. (C8F). On mental status evaluation, the claimant was cooperative and spontaneous, he made good eye contact and had normal speech. The claimant had a constricted affect but his thought process was goal directed and his attention and concentration were intact (Exhibit C8F). Dr. Sharma diagnosed the claimant with major depressive disorder and assigned him a GAF score of 55 (C8F/19). Dr. Sharma started the claimant on medication and encouraged him to continue therapy sessions. The claimant was also encouraged to look for work (Exhibit C8F/19).

The claimant returned for a medication management visit and reported that he did not see any changes after he added the medication (Exhibit C8F/13). However, on examination, the claimant made good eye contact and was cooperative. He had intact concentration and attention and memory (Exhibit C8F/14). In a visit on May 20, 2013, the claimant reported that he was doing well and that his anxiety was improving (Exhibit C8F/9). The claimant continued to report improvement in a July 2013 visit and he said that he was doing very well and he had normal findings on examination (Exhibit C8F/5). The claimant stopped taking his medication but in a September 2013 visit, he reported that seeing a counselor was helping him (Exhibit C8F/1). The claimant reported that his anxiety was good and he had normal findings on mental status evaluation (C10F/5). On December 23, 2013, the claimant was seen by Dr. Sharma for medication management and reported that he was not taking any medication but was doing "very well" (C10F/l). After a long gap in treatment, the claimant once again followed up with Dr. Sharma in October 2015 (C15F/10). At that appointment, the claimant noted he was angry and irritable, and his Prozac was restarted (C15F/11). In January 2016, the claimant was doing well, but was having difficulty sleeping, so Dr. Sharma added trazadone (C15F/6, C15F/7). By May 2016, the claimant was once again doing fairly well, with a good mood and no irritability (C15F/4). He was alert with no agitation, and denied suicidal thoughts and had intact attention, concentration, and memory (C15F/5). Records indicate that once the claimant's medication was restarted, his mood quickly stabilized.

The claimant also treated with counselor Kristin Rinehart, LISW, during this time (Exhibit C14F/46, 48). During visits with her, he discussed more difficulties than

3

> he mentioned to Dr. Sharma (C14F/41, 42). However, Ms. Rinehart often found primarily normal results on mental status evaluations (C14F/16, 23, 29, 30, 32, 34, 40, 41).
>
> In an October 19, 2015 progress note with Dr. Sharma, the claimant reported that he was not doing well and was angry and irritable (C14F/60). On mental status examination, he was cooperative with good eye contact, intact memory, intact concentration and normal speech (Exhibit C14F/61). However, in November 2015, the claimant reported that he was doing well and he had normal findings on examination (C14F/59). His counselor also continued to find generally normal results on mental status evaluations (Exhibit C14F/12). In January 2016, the claimant stated that he had good holidays, was doing well and had a good mood (C14F/56). On examination, he made good eye contact, was cooperative, and had intact concentration and attention (C14F/57). The claimant continued to report doing well (C14F/3, 5, 9, 52, 54, C15F).
>
> Recent counseling records from Ms. Rinehart reflect that although the claimant continues to have some depressive symptoms and increased frustration at times, he has continued to spend time with friends, remain active, and complete his activities of daily living (C17F/27, C17F/33). Even while experiencing an increase in symptoms, Ms. Rinehart noted that he had appropriate behavior, goal directed thought processes, and was alert and oriented with age appropriate insight and judgment (C17F/37).

(Tr. 788–90).

### C. The ALJ's Decision

The ALJ found that Plaintiff had the following severe impairments: borderline intellectual functioning; mood disorder; depressive disorder; personality disorder; and an anxiety disorder. (Tr. 783). The ALJ held, however, that there was no medical opinion of record to indicate the existence of an impairment or combination of impairments that met or equaled in severity the level of the Listings of Impairments. (Tr. 784).

In formulating Plaintiff's residual functional capacity ("RFC"), the ALJ considered multiple medical source opinions:

> In forming this residual functional capacity, I have given partial weight to the opinion of the consultative psychological consultants (C4A, C6A). The opinions

4

of the State Agency are generally consistent with the evidence in that they limit the claimant to 1-2 step tasks, with no fast-paced performance or strict production quotas, and minimal contact with others. However, I have used more vocationally relevant and specific terms in limiting the claimant to no interaction with the general public and only occasional interaction with coworkers or supervisors. Indeed, as explained above, the evidence shows that the claimant was most often cooperative with others and had no noted difficulties with providers or performing a range of activities including attending a concert. While Karen Terry, Ph.D., the State Agency consultant at the reconsideration level of review, opined that the claimant needed no constant direct over-the-shoulder supervision and correction/criticism in a constructive manner, I did not fully adopt this these limitations. Instead, I determined that based upon the evidence as a whole, the claimant should not work in tandem and should have only occasional interaction with supervisors. Further, while I did not include this restriction regarding supervision or close contact specifically within the residual functional capacity, I did confirm with Dr. Growick, the vocational expert, that the jobs he provided did not have over the shoulder supervision or close supervision. Dr. Growick elaborated that any jobs that did have that level of supervision would be performed in a more supportive environment and would have a job coach on the jobsite (Hearing Testimony). Additionally, the record as a whole does not provide support for the restriction that correction or criticism needs to be presented in a constructive manner. As noted, the claimant has often shown to be cooperative with his treating providers, and he has never been fired or let go from a job because of difficulties interacting with his supervisors or coworkers (C4E/7). The State Agency psychologist's opinion is not fully accepted as she relied to a great extent on the claimant's subjective statements, but the treatment notes show little difficulty with interaction with others and in fact minimal reports of mental limitations.

Turning now to the opinion of Dr. Lewin at C4A, as the Appeals Council remand noted, Dr. Lewin opined that the claimant should be limited to 1-2 step tasks (C4A/8, C12A/5). In its remand order, the Appeals Council noted that I did not adequately explain whether I was adopting the 1-2 step task limitation expressed by Dr. Lewin. I find that the record as a whole does not support limiting the claimant to only 1-2 step tasks, but instead supports limiting him to simple, routine, repetitive tasks with only simple work related decisions and few, if any, workplace changes. As discussed above, on mental status examinations, the claimant has been found to have intact memory, attention, and concentration (C8F/2, C14F/2, C15F/3, C15F/5). Further, the claimant has previously been employed as a car mechanic, which is an SVP 5 position per the testimony of the vocational expert, Dr. Growick. According to the claimant, he did not have difficulty performing the work or learning the job required of him, but instead was let go after a mistake caused damage to a car. He specifically noted that had his employer let him pay for the damage to the car, he would have continued to work in this position (Hearing Testimony). Therefore, the claimant's past work history and the record as whole

better supports the limitation to simple, routine, repetitive tasks, and does not support additionally restricting the claimant to only 1-2 step tasks.

I have also given partial weight to the opinion of consultative psychological examiner, Dr. Sisson (C4F). Dr. Sisson found that the claimant would be limited to simple work tasks, low stress work, and would work at a slower pace and these findings are generally consistent with his intelligence testing and records noting his borderline intellectual functioning. However, to the extent that Dr. Sisson found that the claimant would require supervision, checks for understanding, and redirection of tasks, these have not been accepted. The totality of the evidence, including minimal mental impairments on assessment and the claimant's prior work history, do not support the extent of these limitations. On testing throughout the record, the claimant was found to have no deficits in memory, attention or concentration.

(Tr. 790–91).

After reviewing the medical record and opinion evidence, the ALJ analyzed Plaintiff's RFC, concluding that:

[T]he claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: He can perform simple, routine, repetitive tasks involving only simple work related decisions and with few, if any, workplace changes. He cannot work in occupations that require strict production quotas or fast paced work, such as on an assembly line. He should have no interaction with the general public and only occasional interaction with coworkers and supervisors. He should not work in any position that requires tandem tasks or conflict resolution responsibilities.

(Tr. 787). He further found that:

while the claimant has medically determinable impairments that could reasonably cause some symptoms and limitations, the above evidence shows that the claimant's testimony regarding the extent of such symptoms and limitations is not fully consistent with the evidence. However, the claimant's complaints have not been completely dismissed, but rather, have been included in the residual functional capacity to the extent that they are consistent with the evidence as a whole. The location, duration, frequency and intensity of the claimant's alleged symptoms, as well as precipitation and aggravating factors are adequately addressed in the above residual functional capacity.

(Tr. 792).

The ALJ, therefore, concluded that "[t]he claimant is capable of performing past relevant work as a car mechanic helper. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 416.965)." (*Id.*). He also found that "there are other jobs existing in the national economy that he is also able to perform," including laundry worker and packer. (Tr. 793–94).

## II. STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

## III. DISCUSSION

Plaintiff argues that the ALJ's RFC analysis is not supported by substantial evidence. (Doc. 14 at 14–19). Specifically, he argues that the ALJ "failed to weigh the opinion evidence in accordance with the appropriate legal standards," challenging the ALJ's consideration of the opinions of Drs. Lewin, Terry, and Sisson. (*Id.*).

A plaintiff's RFC "is defined as the most a [plaintiff] can still do despite the physical and mental limitations resulting from her impairments." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 155 (6th Cir. 2009); *see also* 20 C.F.R. §§ 404.1545(a), 416.945(a). The Social Security regulations, rulings, and Sixth Circuit precedent provide that the ALJ is charged with the final responsibility in determining a claimant's residual functional capacity. *See, e.g.*, 20 C.F.R. § 404.1527(d)(2) (the final responsibility for deciding the residual functional capacity "is reserved to the Commissioner"). In doing so, the ALJ is charged with evaluating several factors when determining the RFC, including the medical evidence (not limited to medical opinion testimony), and the claimant's testimony. *Henderson v. Comm'r of Soc. Sec.*, No. 1:08-cv-2080, 2010 WL 750222, at *2 (N.D. Ohio Mar. 2, 2010) (citing *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004)). Ultimately, it is the ALJ who resolves conflicts in the medical evidence. *King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984).

"The Social Security Administration defines three types of medical sources: non-examining sources, non-treating (but examining) sources, and treating sources." *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 273 (6th Cir. 2015) (citing 20 C.F.R. § 404.1502). When the opinion comes from a non-treating or non-examining source, it is usually not entitled to controlling weight. 20 C.F.R. § 404.1527(c)(2). Rather, the ALJ should consider relevant factors,

including supportability, consistency, and specialization. 20 C.F.R. § 404.1527(d)(2). There is however, no "reasons-giving requirement" for non-treating source opinions. *Martin v. Comm'r of Soc. Sec.*, 658 F. App'x 255, 259 (6th Cir. 2016). Instead, the ALJ must provide only "a meaningful explanation regarding the weight given to particular medical source opinions." *Mason v. Comm'r of Soc. Sec.*, No. 1:18 CV 1737, 2019 WL 4305764, at *7 (N.D. Ohio Sept. 11, 2019) (citing SSR 96-6p, 1996 WL 374180, at *2).

### A. Dr. Karen Terry

The ALJ did not err in his analysis of Dr. Terry's opinion. Relevant here, Dr. Terry opined that Plaintiff "will perform optimally in a more solitary setting, where tasks do not require direct collaborative efforts with others for task completion and he is not required to interact with the general public." (Tr. 120). Continuing, she stated that Plaintiff "should not be required to have constant direct over-the-shoulder supervision and correction/criticism needs to be presented in a constructive manner." (*Id.*).

The ALJ concluded that Dr. Terry's opinions were "generally consistent with the evidence" and limited Plaintiff "to no interaction with the general public and only occasional interaction with coworkers or supervisors." (Tr. 790). He applied this limitation despite finding that "the evidence shows that the claimant was most often cooperative with others and had no noted difficulties with providers or performing a range of activities including attending a concert." (*Id.*).

Addressing Dr. Terry's opinion that Plaintiff "should not be required to have constant direct over-the-shoulder supervision and correction/criticism needs to be presented in a constructive manner," the ALJ stated that he "did not fully adopt these limitations," but found that "based upon the evidence as a whole," limiting Plaintiff to "not work[ing] in tandem and … only

9

occasional interaction with supervisors" addressed those concerns. (*Id.*). The ALJ confirmed that the jobs that Plaintiff could perform would not require "over the shoulder supervision" and emphasized that the record did support the limitation that "correction or criticism need[ed] to be presented in a constructive manner." (*Id.*). In contrast, he emphasized, Plaintiff "has often been cooperative with his treating providers, and he has never been fired or let go from a job because of difficulties interacting with his supervisors or coworkers." (*Id.*).

In the Court's view, the ALJ provided a meaningful explanation for the weight assigned to Dr. Terry's opinion. He noted that Dr. Terry's proposed limitation regarding constructive criticism was not supported by the record and stressed that the record demonstrated consistently that Plaintiff was cooperative with others. (*See id.*). The Regulations do not require more. *See* 20 C.F.R. § 404.1527(d)(2).

Plaintiff, nonetheless, argues that the ALJ ignored key evidence supporting Dr. Terry's opinion that he needed correction or criticism to be given in a constructive manner. (Doc. 14 at 15–16). There is no dispute that the record contains some evidence of Plaintiff's interpersonal difficulties. (*See id.*). But the relevant question is whether substantial evidence supports the ALJ's conclusion, and, on the record before the Court, (*see* Tr. 788–90), there is no question that it does. In other words, "[e]ven if it is true that the record contains some evidence that may support Plaintiff's argument, the ALJ's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion." *Bryan v. Commissioner of Soc. Sec.*, No. 2:18-CV-554, 2019 WL 2021156, at *7 (S.D. Ohio May 8, 2019), *report and recommendation adopted sub nom. Bryan v. Comm'r of Soc. Sec.*, No. 2:18-CV-554, 2019 WL 2912089 (S.D. Ohio July 8, 2019) (citation and quotations omitted). "Rather, it is the ALJ's

function to resolve conflicts in the evidence, and that is exactly what the ALJ did here." *Id.* (internal citation and quotations omitted).

Because the ALJ considered the relevant regulatory factors and provided a meaningful explanation in analyzing Dr. Terry's opinion, he did not err.

**B.  Dr. Caroline Lewin**

Plaintiff's argument that the ALJ erred in his analysis of Dr. Lewin's opinion evidence is similarly unpersuasive. Relevant here, after an earlier decision, the Appeals Council remanded to the ALJ with instructions to explain whether he was adopting Dr. Lewin's opinion that Plaintiff should be limited to 1–2 step tasks. (Tr. 790–91). The ALJ found "that the record as a whole" did not support that limitation; instead, he concluded, it supported limiting Plaintiff "to simple, routine, repetitive tasks with only simple work related decisions and few, if any, workplace changes." (Tr. 791). In support of this conclusion, the ALJ cited evidence that Plaintiff had "intact memory, attention, and concentration" and had "previously been employed as a car mechanic." (*Id.*). Relying on Plaintiff's testimony, the ALJ stated that Plaintiff "did not have difficulty performing the work or learning the job required of him, but instead was let go after a mistake caused damage to a car." (*Id.*).

Given the low bar for evaluating the opinion of non-treating sources, the ALJ did not err here. He cited the medical record and Plaintiff's work history to support his conclusion that Dr. Lewin's opinion limiting Plaintiff to 1–2 step tasks was not supported by the record. And in doing so, the ALJ satisfied the requirement that he provide a "meaningful explanation," *Mason*, 2019 WL 4305764, at *7 (citing SSR 96-6p, 1996 WL 374180, at *2), regarding the weight given to Dr. Lewin's opinion.

Plaintiff disagrees and cites numerous pieces of evidence that he believes support Dr. Lewin's proposed limitation. (Doc. 14 at 18). But again, it is the ALJ's job to resolve conflicts in the evidence, and so long as his analysis is supported by substantial evidence, the Court will not reverse his decision. *See Bryan*, 2019 WL 2021156, at *7. Because that is the case here, the Court finds no error in the ALJ's analysis of Dr. Lewin's opinion.

### C. Dr. Dory Sisson

Plaintiff's argument regarding the ALJ's analysis of Dr. Sisson's opinion fares no better. The ALJ gave "partial weight" to the opinion of Dr. Sisson. (Tr. 791). On the one hand, he noted, Dr. Sisson's opinion that Plaintiff "would be limited to simple work tasks, low stress work, and would work at a slower pace" was generally consistent with Plaintiff's intelligence testing and borderline intellectual functioning. (*Id.*). On the other hand, the ALJ observed, Dr. Sisson's opinion that Plaintiff "would require supervision, checks for understanding, and redirection of tasks" was not accepted because "the totality of the evidence, including minimal mental impairments on assessment and the claimant's prior work history d[id] not support the extent of these limitations." (*Id.*). Indeed, "[o]n testing throughout the record, [Plaintiff] was found to have no deficits in memory, attention or concentration." (*Id.*).

Again, the Court finds no error in the ALJ's analysis. He explained that the medical record and Plaintiff's work history demonstrated that Plaintiff was not as limited as Dr. Sisson concluded. And while Plaintiff has cited evidence supporting Dr. Sisson's conclusion, (*see* Doc. 14 at 16–17), that conflicting evidence does not compel a finding of error here, *see Bryan*, 2019 WL 2021156, at *7.

\* \* \* \* \* \* \*

For each of the three doctors above, Plaintiff generally argues that "[t]he ALJ rejected the limitations contained" in their opinions "without providing adequate reasons for doing so." (Doc. 14 at 17). He offers two arguments in support of this conclusion. First, Plaintiff asserts that the ALJ ignored evidence in assessing his RFC. (*Id.* (citing *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 881 (N.D. Ohio 2011)). A review of the ALJ's decision suggests otherwise, (*see* Tr. 788–91), and, in any event, "an ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered." *Dykes ex rel. Brymer v. Barnhart*, 112 F. App'x 463, 467 (6th Cir. 2004). Second, Plaintiff contends that the ALJ erred by "reject[ing] the medical opinions and independently craft[ing] an RFC in contradiction of those opinions." (Doc. 14 at 17 (collecting cases)). But, as demonstrated above, the ALJ complied with the applicable regulations in analyzing the relevant opinion evidence, and there is no basis for the Court to order a remand here.

## IV. CONCLUSION

For the reasons stated, Plaintiff's Statement of Errors (Doc. 14) is **OVERRULED**, and judgment is entered in favor of Defendant.

IT IS SO ORDERED.


Date: January 27, 2020                          /s/ Kimberly A. Jolson
                                                KIMBERLY A. JOLSON
                                                UNITED STATES MAGISTRATE JUDGE